# Supervisory Highlights



Fall 2014

# Table of contents

Table of contents .................................................................................................. 2

**1.   Introduction** ......................................................................................... 3

**2.   Supervisory observations** ............................................................... 5

    2.1   Consumer reporting ...................................................................... 5

    2.2   Debt collection .............................................................................. 7

    2.3   Deposits ........................................................................................ 9

    2.4   Mortgage servicing ..................................................................... 11

    2.5   Student loan servicing ................................................................ 14

    2.6   Fair Lending: CFPB's HMDA resubmission schedule & guidelines ...... 18

    2.7   Remedial actions ........................................................................ 19

**3.   Supervision program developments** ........................................... 23

    3.1   Recent CFPB guidance ............................................................... 23

    3.2   Other developments .................................................................... 26

**4.   Conclusion** ....................................................................................... 27

# 1. Introduction

As the Bureau's supervision program enters its fourth year, Supervision continues to conduct examinations of bank and nonbank providers of consumer financial products and services under the Bureau's jurisdiction. In this sixth edition of *Supervisory Highlights*, the CFPB shares recent supervisory observations, such as regulatory violations or unfair, deceptive, or abusive acts or practices (UDAAPs) in the areas of consumer reporting, debt collection, deposits, mortgage servicing, and student loan servicing. This edition also includes updated supervisory guidance about Home Mortgage Disclosure Act (HMDA) reporting. The findings reported here reflect information obtained by Supervision at the time of issuance of an examination report or supervisory letter.

CFPB supervisory work contributed to recent enforcement actions against GE Capital Retail Bank, ACE Cash Express, U.S. Bank, Flagstar Bank, and M&T Bank resulting in relief of approximately $308 million to more than 1.2 million consumers for illegal practices related to credit cards, payday loans, mortgage servicing, and checking accounts. In addition to these public enforcement actions, Supervision continues to resolve violations using non-public supervisory actions, sometimes including those initiated by entities self-reporting violations to Supervision staff. When Supervision examinations determine violations occurred, supervised entities are directed to implement appropriate corrective measures, including remediation to consumers as appropriate.

The CFPB supervises depository institutions and credit unions with total assets of more than $10 billion, and their affiliates. The Bureau also has authority under the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) to supervise nonbanks, regardless of size, in certain specific markets: mortgage companies (originators, brokers, servicers, and providers of loan modification or foreclosure relief services); payday lenders; and private education lenders.

The CFPB may also supervise the "larger participants" in other nonbank markets as the Bureau defines by rule. To date, the Bureau has issued four rules defining larger participants in the following markets: consumer reporting (effective September 2012), consumer debt collection (effective January 2013), student loan servicing (effective March 2014), and most recently, international money transfers (effective December 2014).

This report highlights supervision work generally completed between March 2014 and June 2014. Any questions or comments can be directed to CFPB_Supervision@cfpb.gov.

# 2. Supervisory observations

As noted in previous issues of *Supervisory Highlights*, compliance management system (CMS) reviews remain a priority in CFPB's examination program. Recent examinations have seen, especially in the nonbank sector, increased efforts by supervised entities to develop more robust compliance management systems. At both bank and nonbank entities, examiners have observed increases in resources dedicated to compliance, changes in reporting structures to ensure compliance issues are heard and addressed by the board of directors (or other controlling person(s)), and instances of self-identified issues resulting in remediation to consumers.

Below are some of Supervision's recent observations from examinations in consumer reporting, debt collection, deposits, mortgage servicing, student loan servicing; updated guidance on HMDA reporting; and recent enforcement actions resulting at least in part from supervisory work.

## 2.1   Consumer reporting

As discussed in a past issue of *Supervisory Highlights*,[1] an important focus of the CFPB's consumer reporting examination program is how consumer reporting agencies (CRAs) carry out their dispute-handling obligations under Section 611 of the Fair Credit Reporting Act (FCRA).[2] Under Section 611, a consumer may dispute the completeness or accuracy of any information contained in his or her file at a CRA. Section 611 also requires CRAs to conduct reasonable

---

[1] *See* Supervisory Highlights: Spring 2014 at 9, *available at:* http://www.consumerfinance.gov/reports/supervisory-highlights-spring-2014/.

[2] 15 USC 1681 *et seq.*

reinvestigations of such disputes and to provide consumers with written notice of the results of those reinvestigations. During their reviews, CFPB examiners found that one or more CRAs failed to comply with Section 611(a)(6), which specifies the information that must be included in the written notice following the completion of a reinvestigation. For example, examiners found that, for a period of several months, one or more CRAs failed to provide disputing consumers with (i) a statement that the reinvestigation was complete; (ii) a notice that, if requested by the consumer, it would describe the procedure it used to conduct the investigation; (iii) a notice that the consumer could add a statement of dispute to his or her file; and (iv) a notice that the consumer could request the CRA to notify certain third parties of any deletions it made (or, if applicable, the statement of dispute). Examiners attributed these violations to weaknesses in the monitoring and corrective action programs in place at the relevant entities, and Supervision directed those entities to enhance their programs to ensure compliance with Section 611.

In the course of examining dispute handling at one or more nationwide specialty consumer reporting agencies (specialty CRAs), CFPB examiners found that the processes of at least one specialty CRA were inconsistent with regard to handling disputes received by telephone. Specifically, examiners found that specialty CRA agents provided inconsistent information regarding the ability of consumers to lodge disputes by telephone. Supervision concluded that such inconsistencies created compliance risks and potentially discouraged consumers from completing the dispute process. CFPB examiners also found that at least one specialty CRA maintained a weak general consumer complaint program. Specifically, examiners found program(s) that lacked a formal definition for direct consumer complaints, did not provide training on how to handle such complaints, and inconsistently tracked such complaints. One or more nationwide CRA's procedures also failed to cover complaints received directly from consumers, creating a risk that the entities would fail to identify compliance issues presented by those complaints.

## 2.2    Debt collection

The Bureau began its supervision of larger participant debt collectors in January 2013. In recent examinations, the Bureau's examiners identified an unfair practice and several violations of the Fair Debt Collection Practices Act (FDCPA).[3]

### 2.2.1    Unlawful imposition of convenience fees

The FDCPA limits the situations where a debt collector may impose convenience fees. One limit is when state law is silent regarding the legality of imposing convenience fees and the contract creating the debt does not authorize the imposition of such fees. In one or more examinations of debt collectors, examiners observed that convenience fees, which ranged from $5 to $14, were imposed if a consumer made payment using either a credit or a debit card. Due to a systems failure, fees were imposed on consumers who lived in states where state law prohibited the collection of such convenience fees. One or more collectors also imposed convenience fees on consumers who lived in states where the law was silent regarding the collection of fees without reviewing the agreements creating the consumer debts to find out if those agreements expressly authorized the collection of such fees. Supervision directed these collectors to identify consumers who were improperly charged convenience fees, and to develop a plan for reimbursing those consumers.

### 2.2.2    False threats of litigation

The FDCPA prohibits a debt collector from threatening a consumer with any action it does not intend to undertake.[4] Accordingly, a debt collector violates the FDCPA when it threatens a consumer with litigation it does not intend to pursue. In at least one examination, Supervision staff determined that a collector routinely threatened consumers with litigation even though it generally did not intend to file suit. Litigation was initiated on only a small fraction of the

---

[3] 15 USC 1692-1692p.

[4] 15 USC 1692e(5); *see also* 12 USC 1692e(10) (prohibiting "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt").

accounts collected. Supervision directed one or more collectors to cease threatening consumers with litigation it did not intend to pursue.

### 2.2.3   Faulty training materials causing prohibited disclosures to third parties

The FDCPA prohibits a debt collector's representatives from identifying their employer when communicating with a third party for the purpose of acquiring location information, unless expressly requested to do so.[5] During one or more examinations, Supervision determined that representatives regularly identified their employer to third parties without being expressly requested to do so. This collector provided faulty training materials that directed its representatives to disclose their name and the name of the collector before identifying the party with whom they were speaking. Supervision directed the collector to conduct remedial training and update its training program, and monitor its collection agents to ensure effectiveness of the training program.

### 2.2.4   Unfair practices with respect to debt sales

In examining one or more financial institutions that sold charged-off credit card debt to debt buyers, Supervision's examination team identified unfair practices connected to those sales. First, with respect to a substantial number of accounts that were sold to debt buyers, at least one financial institution overstated the annual percentage rates (APRs) in the account documents provided to each debt buyer. Specifically, one or more financial institutions reported APRs that exceeded the rate for which the consumer was liable pursuant to the credit agreement. Second, in some instances, when at least one financial institution received payments from consumers on accounts post-sale, forwarding the payments to the appropriate debt buyer was significantly delayed, with delays ranging from two months to over two years. The relevant financial institutions have undertaken remedial and corrective actions regarding these violations, which are under review by the Bureau.

---

[5] 15 USC 1692b(1).

## 2.3    Deposits

 The Electronic Fund Transfer Act (EFTA) establishes the basic rights, liabilities, and responsibilities of consumers who use electronic fund transfer and remittance transfer services and of financial institutions or other persons that offer these services. The primary objective of the EFTA and its implementing regulation, Regulation E,[6] is the protection of individual consumers engaging in electronic fund transfers and remittance transfers.

Regulation E contains specific procedures for financial institutions to use to resolve errors reported by consumers related to electronic fund transfers, including requirements governing the prompt investigation of errors, providing timely provisional credit, and providing consumers with notice of the findings of the financial institution's investigation and the right to obtain the documentation the financial institution relied upon.[7] Outlined below are some significant Supervision findings in this area. When violations of Regulation E are identified, Supervision directs entities to determine the cause of the violations and implement appropriate corrective actions.

### 2.3.1    Violations of error resolution requirements

Regulation E prescribes the timeframe for resolving errors and generally requires a financial institution to investigate and determine whether an error occurred within 10 business days of receiving a notice.[8] Consumers may report an error either orally or in writing. Examiners cited violations of Regulation E at one or more institutions that, in the case of an oral notice of error, would wait until the customer had returned a dispute confirmation form before initiating an investigation. Examiners further found that at least one institution waited to request additional information until the written confirmation was received, and would require the consumer to respond to the request for additional information within 10 days of the original notice. Unless the consumer submitted the additional information requested within 10 days of the original notice, consumers would be denied their claim due to lack of information. At one or more

---

[6] 12 CFR 1005.

[7] 12 CFR 1005.11.

[8] 12 CFR 1005.11(c)

financial institutions, examiners found that customers who complained about unauthorized transactions were told they must first contact the merchant, where applicable, before an investigation would begin.

Consistent with Regulation E, a financial institution may request written confirmation of an oral notice within 10 days of the notice.[9] However, a financial institution must begin its investigation promptly upon receipt of an oral notice.[10] The Official Interpretations further state that a financial institution cannot delay an investigation until the financial institution has received a written confirmation.[11]

Regulation E also sets forth the timing and content requirement to assert an error, specifically, sufficient information to identify the consumer's name and account number and why the consumer believes an error exists, including, to the extent possible, the type, date, and amount of the error.[12] A financial institution cannot deny an error claim on the basis of a consumer failing to provide additional information, or require the consumer to contact the merchant involved first.

## 2.3.2   Violations regarding liability for unauthorized transfers

Under Regulation E, if a consumer notifies a financial institution within two business days after learning of the loss or theft of an access device, the consumer's liability shall not exceed the lesser of $50 or the amount of unauthorized transfers that occurred before notice was provided to the financial institution.[13] Negligence by the consumer cannot be used as the basis for imposing greater liability than is permissible under Regulation E.[14] During one or more

---

[9] 12 CFR 1005.11(b)(2).

[10] *See* Official Interpretations to 12 CFR 1005.11(b)(1)-2.

[11] *Id.*

[12] 12 CFR 1005.11(b)(1).

[13] 12 CFR 1005.6(b)(1).

[14] *See* Official Interpretations to 12 CFR 1005.6(b)-2.

examinations, Supervision found a violation of Regulation E when, despite a consumer's provision of details of the theft of a debit card and subsequent unauthorized PIN-based transfers, the consumer's claim was denied based on the fact that the customer was unable to explain how his PIN was compromised.

In these cases, Supervision directed institutions to revise policies and procedures and implement training to appropriately address these particular provisions of Regulation E.

### 2.3.3   Notice deficiencies

Regulation E requires institutions to advise consumers both of the results of the error notice investigation and the consumers' right to obtain the documentation the institution relied upon in its error resolution investigation(s).[15]

The standard form error resolution notices used by one or more of the financial institutions examined by Supervision failed to include a statement regarding a consumer's right to obtain the documentation that the institution relied on in its error resolution investigations as required by Regulation E.[16] At least one institution used notice templates referencing the issuance of provisional credit regardless of whether provisional credit was issued. These omissions and inconsistencies raise significant consumer protection concerns, and Supervision directed the institutions to correct these notice forms.

## 2.4   Mortgage servicing

The CFPB's new mortgage servicing rules took effect on January 10, 2014. These rules affect many aspects of mortgage servicing, including payment processing, periodic statements, and force-placed insurance. The rules also impose early intervention requirements and continuity of contact obligations on servicers for certain borrowers, as well as procedural requirements for loss mitigation applications. CFPB mortgage servicing examinations now include reviews for

---

[15] 12 CFR 1005.11(d)(1).

[16] *Id.*

compliance with these new regulations. Moreover, conduct that does not violate one of the specific requirements or prohibitions may constitute an unfair, deceptive, or abusive act or practice (UDAAP). This section will discuss Supervision's initial new rules work and certain UDAAPs identified in the loss mitigation area.

## 2.4.1   New mortgage servicing rules

In the first half of this year, Supervision conducted targeted reviews examining for compliance with the new rules. For example, the new rules obligate servicers to maintain policies and procedures that are reasonably designed to achieve specific objectives, including objectives related to loss mitigation, servicing transfers, and service provider oversight.[17]

In reviewing this area, examiners found that the policies and procedures at several servicers appeared to be reasonably designed to meet the specific objectives laid out in the rule. For example, some servicers' policies and procedures clearly outlined the ways in which they access and provide timely and accurate information. These policies and procedures included specific written guidance as to who accesses the information, when they access it, and which software systems they use to obtain the information.

In contrast, Supervision cited violations based on policies and procedures reviewed at other servicers. Specifically, the rules require servicers to have policies and procedures reasonably designed to ensure servicers can provide servicer personnel with access to information reflecting actions performed by service providers, facilitate periodic reviews of service providers, and facilitate sharing of information regarding a borrower's loss mitigation application between the servicer and service provider. Examiners found that one or more servicers lacked any policies and procedures relating to oversight of service providers. Moreover, some policies and procedures reviewed by examiners did not reflect all of service provider relationships as defined by Regulation X; additionally, one or more servicers failed to maintain policies and procedures to facilitate periodic reviews of service providers. Finally, one or more servicers failed to maintain policies and procedures reasonably designed to facilitate the sharing of loss mitigation information when necessary: the policies and procedures failed to identify what information

---

[17] 12 CFR 1024.38(a), (b).

should be shared with service providers, who would provide it, and timeframes for sharing the information.

When examiners detected weaknesses in servicer policies and procedures, Supervision directed the servicers to improve their policies and procedures.

## 2.4.2   Loss mitigation

### Loan modifications

In offering loan modifications to certain borrowers to avoid foreclosure, a servicer may require a borrower to complete a trial modification for a short period before it finalizes a permanent modification. In at least one examination, examiners found servicer failures to timely convert a substantial number of trial modifications to permanent modifications after the successful completion of a trial modification. The delays harmed borrowers who then owed higher amounts of accrued interest under the finalized permanent modifications than they would have owed under a timely conversion. During the delay for each borrower, the interest accrued at the original contractual rate, rather than at the lower rate provided under the permanent modification's terms. The servicers then capitalized the additional interest into the principal balance owed under the permanent modification. The servicers also continued to report borrowers that had been delinquent at the beginning of their trial modifications as delinquent to the consumer reporting agencies during the length of the delays. Supervision determined that the substantial delays, combined with the negative consequences attributable to the delays, constituted an unfair practice.

Moreover, at least one servicer sent permanent modification agreements to some borrowers that did not match the terms approved by its underwriting software. Many borrowers signed and returned the agreements, but then the agreements were not executed by the servicer(s). Instead, after substantial delays, borrowers were sent updated modification agreements with materially different terms. These misrepresentations about the available terms affected the ultimate payment the borrowers would make, influencing both whether they would accept the modification and how they could subsequently budget based on their expected payment. Supervision determined that one or more servicers engaged in a deceptive practice in connection with these modifications.

During examinations at one or more servicers, examiners detected a deceptive act relating to loss mitigation. For example, a servicer would notify a borrower regarding eligibility for two

different modifications – one a Home Affordable Modification Program (HAMP) modification and one a proprietary modification. One or more servicers, through a series of communications, touted the benefits of the proprietary option while downplaying its drawbacks and also misrepresenting aspects of the HAMP modification. The Bureau directed one or more servicers to compensate borrower(s) for the financial difference between the two modifications, in light of these misrepresentations.

## Short sales

At one or more servicers, examiners identified a deceptive practice relating to the servicer's communications regarding deficiency balances resulting from short sales. Servicer representatives told consumers that a deficiency judgment relating to a short sale would not be sought. However, the resulting short sale approval agreements did not specifically waive a loan owner's right to pursue a deficiency judgment. Because a reasonable consumer would understand the statement to mean that if a borrower agreed on a short sale, there would be no deficiency judgment from any entity, Supervision cited this practice as deceptive.

# 2.5   Student loan servicing

The authority to supervise the federal and private student loan servicing activities affiliated with large banks for compliance with Federal consumer financial laws was transferred to the CFPB in July 2011. In December 2013, the CFPB issued its rule defining nonbank larger participants in the student loan servicing market.[18] The CFPB began conducting supervisory examinations of those larger participants after the rule became effective in March 2014. When reviewing student loan servicing activities, Supervision primarily assesses whether these activities have been conducted free from unfair, deceptive, or abusive acts or practices prohibited by the Dodd-Frank Act.[19] CFPB examiners have identified a number of unfair or deceptive acts or practices, described below.

---

[18] 12 CFR 1090.106.

[19] 12 USC 5536(a)(1)(B).

### 2.5.1   Allocating partial payments in a way that maximizes late fees

CFPB examiners identified an unfair practice where one or more supervised entities proportionally allocated partial payments among loans in a student loan account in a manner that maximized late fees and was not adequately communicated to consumers.

Typically, servicers handle multiple student loans for each borrower in one combined student loan account. Servicers typically bill borrowers for the sum of the minimum monthly payment for each loan. The servicer allocates a borrower's single payment among the borrower's loans to satisfy the monthly payment for each loan.

CFPB examiners have reviewed how servicers allocate payments when a borrower pays less than the total amount due on all of the loans in the borrower's account. Examiners found that partial payments were being allocated proportionally, or pro rata, among all the loans, resulting in all of the loans in a borrower's account becoming delinquent. In instances that examiners observed, each loan in the account was then charged a minimum late fee.[20] Taken together, these practices maximized the late fees for the consumer. Further, examiners did not observe plausible options for borrowers to avoid the additional late fees. Supervision cited these fee-maximizing practices as unfair under the Dodd-Frank Act.

### 2.5.2   Misrepresentations about required minimum payments on billing statements

CFPB examiners identified a deceptive practice where a student loan servicer represented to consumers that an inflated minimum payment was due on periodic statements and online account statements. The minimum payment amount included accrued interest on loans that were still in deferment, which was therefore not actually due.

---

[20] For example, a minimum late fee may take the form of a number of assessment methodologies, including but not limited to: (1) a simple flat fee assessed for late payment of an individual loan, or (2) a fee based on the percent of the unpaid balance, rounded up to a minimum amount for each loan.

### 2.5.3   Charging improper late fees

CFPB examiners found one or more supervised entities that were charging late fees when payments were received during the grace period. Like many other types of loans, many student loan contracts have grace periods after the due date. If a payment is received after the due date but during the grace period, the promissory note stated that late fees would not be charged. Examiners have found instances where late fees were being charged during the grace period; Supervision identified these instances as unfair and deceptive practices and directed that entities cease charging late fees on full payments provided within the contractual grace period.

### 2.5.4   Failure to provide accurate tax information

Supervision found that one or more student loan servicers failed to provide consumers with information essential for deducting student loan interest payments on their tax filings. The IRS allows a consumer to deduct up to $2,500 of interest paid on student loans if the student loan is used for qualified higher education expenses and the borrower meets other eligibility requirements. Treasury guidelines require student loan lenders or servicers to receive certification from consumers that the student loan was used for qualified higher education expenses, which is usually part of the loan application itself. Student loan servicers typically provide consumers with the amount of annual qualified student loan interest paid on a 1098-E tax form if the consumer paid more than $600 in annual qualified student loan interest.

In at least one examination, Supervision concluded that a student loan servicer, without adequate disclosures, required consumers to provide an additional certification that a student loan was used for qualified higher education expenses, even though such borrowers had already supplied this information in their loan applications. If consumers did not provide the additional certification, they were not furnished with 1098-E forms, impeding their access to a valuable tax benefit. Examiners found this practice was unfair. Furthermore, misrepresentations were made to these consumers that they had paid no deductible student loan interest on their online account statements if the additional certification was not completed. Examiners found this practice was deceptive when borrowers had in fact paid deductible student loan interest.

### 2.5.5    Misrepresentations about discharging student loans in bankruptcy

CFPB examiners found one or more supervised entities that were misrepresenting to consumers that student loans are never dischargeable in bankruptcy.

Student loans are more difficult to discharge in bankruptcy than most other types of loans. To discharge a student loan in bankruptcy, a borrower must affirmatively assert and prove "undue hardship" in a court. Examiners reviewed communications to student loan borrowers about filing bankruptcy and found statements misrepresenting borrowers' ability to discharge loans in bankruptcy. These statements asserted or implied that student loans were never dischargeable. Examiners identified communications of this nature as deceptive. When this occurred, Supervision directed entities to implement policies and procedures and appropriate oversight to clarify that no verbal or written communications should categorize student loans as never dischargeable in bankruptcy.

### 2.5.6    Improper telephone communications

In at least one examination, Supervision cited a student loan servicer for an unfair practice because its automated dialer routinely placed telephone calls to delinquent consumers in the early morning or late at night, which examiners determined was a form of harassment and an unfair practice. During the review, examiners identified more than 5,000 calls made at inconvenient times during a 45-day period, which included 48 inconvenient calls made to one consumer. The examiners concluded that the inconvenient calls resulted from an automated dialer with deficient controls. Specifically, the automated dialer was not programmed to account for information related to the consumers' locations. Supervision directed the entity to improve internal controls to ensure that it would not place such violative phone calls in the future.

## 2.6   Fair Lending: CFPB's HMDA resubmission schedule & guidelines

The Bureau's examiners have conducted Home Mortgage Disclosure Act (HMDA)[21] Data Integrity Reviews (HMDA Reviews) at dozens of mortgage lenders, both bank and nonbank, and have found that many lenders have adequate HMDA compliance systems, resulting in HMDA data with no errors or very few errors. At some institutions, however, examiners have found inadequate compliance management systems and severely compromised mortgage lending data. On October 9, 2013, the Bureau published its HMDA Resubmission Schedule and Guidelines (HMDA Resubmission Standards)[22] and a HMDA Compliance Bulletin.[23] The Bureau did this to highlight the importance of accurate HMDA data and effective HMDA compliance management systems, and to provide transparency into how the Bureau enforces HMDA. Based on our examination experience, the Bureau has determined that it is appropriate to provide additional guidance with respect to the new standards.

Prior to implementation of the CFPB's HMDA Resubmission Standards in January 2014, CFPB examiners used the Federal Reserve Board's HMDA Resubmission Standards when conducting HMDA Reviews of CFPB-supervised financial institutions that are required to collect and report data pursuant to HMDA[24] and Regulation C[25] (CFPB HMDA Reporters). For the majority of CFPB HMDA Reporters, the CFPB's HMDA Resubmission Standards are generally similar to the Federal Reserve Board's HMDA Resubmission Standards. The Bureau announced a different resubmission standard for the largest CFPB HMDA Reporters – defined as any institution reporting 100,000 (or more) loans on its HMDA Loan Application Register (HMDA LAR) – given the significance of these institutions' impact on access to mortgage credit.

---

[21] 12 USC 2801-2810.

[22] HMDA Examination Procedures (Oct. 2013), *available at:*
http://files.consumerfinance.gov/f/201310_cfpb_hmda_resubmission-guidelines_fair-lending.pdf.

[23] CFPB Bulletin 2013-11 (Oct. 9, 2013), *available at:*
http://files.consumerfinance.gov/f/201310_cfpb_hmda_compliance-bulletin_fair-lending.pdf.

[24] 12 USC 2803.

[25] 12 CFR 1003.4.

In its supervisory work, Bureau staff will follow the CFPB's HMDA Resubmission Standards in reviews of 2014 and subsequent HMDA data, but will continue to follow the previous standards for reviews of 2013 and earlier HMDA data. This will provide CFPB HMDA Reporters with an appropriate opportunity to calibrate their HMDA data collection, reporting, and compliance programs to the Bureau's HMDA Resubmission Standards. Bureau examination teams will continue conducting HMDA Reviews using the resubmission thresholds and guidelines that are appropriate to the year of the data being reviewed.

## 2.7    Remedial actions

The following public enforcement actions resulted, at least in part, from recent supervisory work. As described above, Supervision also continues to resolve matters, where appropriate, using non-public supervisory tools.

### 2.7.1    Public enforcement actions

#### M&T Bank

On October 9, 2014, the Bureau announced an action against Manufacturers and Traders Trust Company (M&T Bank) for deceptively advertising free checking accounts. During an examination, CFPB found that M&T Bank advertised checking accounts to consumers with promises of "no strings attached" free checking, without disclosing key eligibility requirements, in violation of both the Dodd-Frank Act's prohibition on deceptive practices and the Truth in Savings Act as implemented by Regulation DD. In this advertising, M&T Bank did not disclose that free checking account customers had to maintain a minimum level of account activity with deposits and withdrawals to maintain the free account. If there was no account activity for 90 days, the bank automatically converted the "Free Checking" accounts to "M&T First" checking accounts. Consumers with "M&T First" accounts who failed to maintain an average or combined monthly balance of $1,500 were charged fees of $5 to $14 per month. M&T Bank will provide $2.9 million in refunds to the approximately 59,000 consumers deceived into paying fees, and pay a $200,000 civil money penalty for the violations.

## Flagstar Bank

On September 29, 2014, CFPB announced its first enforcement action related to the Bureau's mortgage servicing rules that went into effect in January 2014. Supervision examinations and subsequent investigations revealed that Flagstar Bank, F.S.B., took excessive time to process borrowers' applications for foreclosure relief, failed to tell borrowers when their applications were incomplete, denied loan modifications to qualified borrowers, and illegally delayed finalizing permanent loan modifications – in violation of the Bureau's mortgage servicing rules pertaining to loss mitigation, or the Dodd-Frank Act's prohibition on unfair and/or deceptive acts. As a result of this enforcement action, Flagstar will halt its illegal mortgage servicing activities, pay $27.5 million to victims, and pay $10 million in civil penalties. Flagstar will also engage in efforts to help affected borrowers preserve their homes, and will be prohibited from acquiring servicing rights for default loan portfolios until it demonstrates it has the ability to comply with laws that protect consumers during the loss mitigation process.

## U.S. Bank

On September 25, 2014, CFPB ordered U.S. Bank, N.A., to provide an estimated $48 million in relief to more than 420,000 consumers harmed by illegal billing practices related to "add-on products" for credit cards and other bank products such as mortgage loans and checking accounts. Examination work by the CFPB and the Office of the Comptroller of the Currency (OCC) led to a determination that Bank customers were unfairly charged for certain identity protection and credit monitoring services that they did not receive. Some consumers also unfairly incurred charges for interest and fees as a result of these services. In addition to conveniently repaying customers and strengthening its service provider oversight program, U.S. Bank will pay a $5 million civil money penalty to the CFPB and a $4 million penalty to the OCC.

## GE Capital Retail Bank

On June 19, 2014, CFPB announced that it was ordering GE Capital Retail Bank (GE Capital), now known as Synchrony Bank, to provide an estimated $225 million in relief to consumers harmed by illegal and discriminatory credit card practices. First, GE Capital was ordered to refund $56 million to approximately 638,000 consumers who were subjected to deceptive marketing practices when being sold credit card add-on products. These practices – related to five different debt cancellation add-on products – were uncovered during a CFPB examination conducted between December 2012 and February 2013. Examiners found that GE Capital's telemarketers misrepresented these products in a number of ways, such as:

- Marketing the product as free of charge;
- Failing to disclose consumers' ineligibility;
- Failing to disclose that consumers were making a purchase; and
- Marketing products as a limited time offer when they were not.

Second, in addition to these deceptive marketing practices, the CFPB and the Department of Justice announced a joint enforcement action requiring GE Capital to also provide an additional $169 million to about 108,000 borrowers excluded from debt relief offers because of their national origin. GE Capital had two different promotions that allowed credit card customers with delinquent accounts to settle their balances by paying off a specific portion of their debt, but it did not extend these offers to any customers who indicated that they preferred to communicate in Spanish or had a mailing address in Puerto Rico, even if the customer met the promotion's qualifications. This resulted in Hispanic populations being unfairly denied the opportunity to benefit from these promotions, in direct violation of the Equal Credit Opportunity Act (ECOA). This order represents the federal government's largest credit card discrimination settlement in history.

## ACE Cash Express

On July 10, 2014, CFPB announced an enforcement action against ACE Cash Express, Inc., one of the largest payday lenders in the United States. The Bureau determined that ACE used illegal debt collection tactics to pressure overdue borrowers into taking out additional loans they could not afford. The Bureau conducted the examination of ACE in coordination with the Texas Office of Consumer Credit Commissioner. ACE was ordered to provide $5 million in refunds and to pay a $5 million penalty for these violations.

The CFPB found that ACE used unfair, deceptive, and abusive practices to collect consumer debts, both when collecting its own debt and when using third-party debt collectors to collect its debts. The Bureau found that ACE collectors engaged in a number of aggressive and unlawful collections practices, including:

- Threatening to sue or criminally prosecute;
- Threatening to charge extra fees and report consumers to credit reporting agencies; and
- Harassing consumers with collection calls.

The Bureau alleged that ACE used these illegal debt collection tactics to create a false sense of urgency to lure overdue borrowers into payday debt traps, even when consumers explained to

ACE that they could not afford to repay the loan. The Bureau alleged this creation of a false sense of urgency to get delinquent borrowers to take out more payday loans – while charging new fees each time – is abusive.

# 3. Supervision program developments

Recruiting and training continue to be priority areas for Supervision, as the Bureau makes progress toward its steady state hiring levels. As of October 23, 2014, Bureau examination staff numbers approximately 400 examiners supported by both regional management and headquarters staff. More than 165 of these examiners have been commissioned through the Bureau's internal process, or came to the CFPB with commissions from other regulators.

The Bureau remains committed to publishing guidance documents to aid industry in complying with the Bureau's expectations of supervised entities. Below are summaries of the Bureau's recent guidance documents.

## 3.1   Recent CFPB guidance

### 3.1.1   Bulletin on marketing of credit card promotional APR offers

On September 3, 2014, CFPB released a bulletin to inform credit card issuers of the risk of engaging in deceptive and/or abusive acts and practices in connection with solicitations that offer a promotional annual percentage rate (APR) on a particular transaction over a defined period of time.[26] The Bureau has observed that certain solicitations for such offers do not clearly

---

[26] CFPB Bulletin 2014-02 (Sept. 3, 2014), *available at:*
  http://files.consumerfinance.gov/f/201409_cfpb_bulletin_marketing-credit-card-promotional-apr-offers.pdf.

and prominently convey that a consumer who accepts the offer and continues to use the credit card to make purchases will lose the grace period on the new purchases if the consumer does not pay the entire statement balance, including the amount subject to the promotional APR, by the payment due date.

### 3.1.2   FFIEC credit practices guidance

On August 22, 2014, the Bureau joined the Board of Governors of the Federal Reserve System (Board), Federal Deposit Insurance Corporation (FDIC), National Credit Union Administration (NCUA), and OCC in issuing interagency guidance regarding certain consumer credit practices.[27] The guidance explains that while the Federal Trade Commission's (FTC) Credit Practices Rule[28] remains in effect, the parallel rules for banks, savings associations, and Federal credit unions would be repealed as a consequence of the Dodd-Frank Act. In this guidance, the agencies noted that regardless of the repeal of these rules, they maintain their supervisory and enforcement authority regarding unfair or deceptive acts or practices, which could include the practices previously addressed in the former credit practices rules.

### 3.1.3   Mortgage servicing transfers bulletin

On August 19, 2014, CFPB released Bulletin 2014-01, a Compliance Bulletin and Policy Guidance titled "Mortgage Servicing Transfers."[29] This document lays out supervisory expectations for servicers engaged in the transfer of mortgage servicing rights; it updates and supersedes CFPB Bulletin 2013-01, "Mortgage Servicing Transfers." It provides examples of policies and procedures that CFPB examiners may consider as helping a servicer to comply with the 12 CFR Part 1024.38 requirements that servicers adopt policies and procedures reasonably designed to achieve the objectives of facilitating the transfer of information during servicing

---

[27] *See* Interagency Guidance Regarding Unfair or Deceptive Credit Practices, *available at:* http://files.consumerfinance.gov/f/201408_cfpb_guidance_ffiec_credit-card-practices.pdf.

[28] 16 CFR 444.1-.5. The FTC's Credit Practices Rule generally prohibits (1) the use of certain provisions in consumer credit contracts, (2) the misrepresentation of the nature or extent of cosigner liability, and (3) the pyramiding of late fees.

[29] CFPB Bulletin 2014-01 (Aug. 19, 2014), *available at:* http://files.consumerfinance.gov/f/201408_cfpb_bulletin_mortgage-servicing-transfer.pdf.

transfers and properly evaluating loss mitigation applications. It also provides examples of policies and procedures, as well as operational failures, that examiners may consider as detrimental to complying with the 12 CFR Part 1024.38 requirements. The compliance bulletin and policy guidance also describes the application of certain other sections of Regulation X to the servicing transfer context and explains certain areas where CFPB examiners will focus when examining for compliance with these section of Regulation X in the servicing transfer context.

### 3.1.4   Mortgage origination "mini-correspondent" guidance

The Bureau became aware that some mortgage brokers may be shifting their business models in the possible belief that doing so will alter the applicability of important consumer protections that apply to transactions involving mortgage brokers. On July 11, 2014, the Bureau issued guidance explaining how the Bureau evaluates mortgage transactions involving mini-correspondent lenders.[30] The guidance sets out some of the questions the CFPB may consider in evaluating mortgage transactions involving mini-correspondent lenders in order to understand their true nature. This evaluation involves examining how the mini-correspondent lender is structured and operating, for example: whether it is continuing to broker loans; its sources of funding; whether it funds its loans through a bona fide warehouse line of credit; its relationship with its investors; and its involvement in mortgage origination activities such as loan processing, underwriting, and making the final credit approval decision.

The guidance makes clear that no single question necessarily determines how the CFPB may exercise its supervisory and enforcement authorities, and that the facts and circumstances of the particular mortgage transaction being reviewed would be relevant to how the Bureau exercises these authorities.

Finally, the guidance confirms that whether parties must comply with the broker compensation rules does not depend on how they may describe their business structure.

---

[30] Policy Guidance on Supervisory and Enforcement Considerations Relevant to Mortgage Brokers Transitioning to Mini-Correspondent Lenders (July 11, 2014), *available at:*
http://files.consumerfinance.gov/f/201407_cfpb_guidance_mini-correspondent-lenders.pdf.

## 3.2   Other developments

### 3.2.1   Larger participant rulemakings

On September 23, 2014, the CFPB published a final rule in the *Federal Register* defining the larger participants in the international money transfer market.[31] Under its existing authority, the CFPB was able to supervise large depository institutions and credit unions, which often provide international transfers; this final rule extends the Bureau's supervisory authority to nonbank providers that meet the threshold of a larger participant in the market. Nonbanks that provide at least one million aggregate annual international money transfers will be larger participants under the rule, which will go into effect on December 1, 2014.

On October 8, 2014, the Bureau published a proposed rule in the *Federal Register* that, if finalized, would expand its supervisory authority over the larger nonbank participants in the automobile financing market.[32] Currently, the Bureau's supervision authority reaches large banks and credit unions that originate automobile loans and leases, but the nonbank members of this market have never been supervised at the federal level. As proposed, the rule would generally allow the Bureau to supervise nonbank automobile financing companies (excluding dealers) that originate 10,000 or more loans and/or leases in a year. The Bureau estimates that about 38 automobile financing companies would be subject to this new oversight, and that collectively, these companies originate around 90 percent of nonbank automobile loans and leases. The proposed rule is open for comment until December 8, 2014. The Bureau intends to issue a final rule after it has reviewed and considered submitted comments.

---

[31] Final Rule: Defining Larger Participants of the International Money Transfer Market, 79 FR 56631 (Sept. 23, 2014), codified at 12 CFR 1090.107.

[32] Proposed Rule: Defining Larger Participants of the Automobile Financing Market and Defining Certain Automobile Leasing Activity as a Financial Product or Service, 79 FR 60762 (Oct. 8, 2014).

# 4. Conclusion

As its Supervision program continues to mature operationally, as well as expand through larger participant rulemakings, the Bureau continues to recognize the value in communicating program findings to CFPB-supervised entities to aid them in efforts to comply with Federal consumer financial law.

To that end, the CFPB remains committed to periodically publishing *Supervisory Highlights* to share general information about examination findings without identifying specific institutions (except for public enforcement actions), to communicate operational changes to the program, and to provide a convenient resource for information on the Bureau's recent guidance documents.